IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Brian Bakalich, )
)
        Plaintiff, )
)
v. ) No. 03 C 1784
)
) Judge Mark R. Filip
Village of Bellwood, et al. )
)
        Defendants. )

MEMORANDUM OPINION AND ORDER

On February 14, 2005, Defendants' motion for summary judgment (D.E. 39) was denied in part and denied without prejudice in part.[1] (D.E. 58.) Defendants filed a renewed motion for summary judgment on the complaint of Brian Bakalich ("Bakalich" or "Plaintiff"), which alleges that two ordinances enacted by the Village of Bellwood ("Bellwood") violated 42 U.S.C. § 1983 by depriving him of his rights secured by the First and Fourteenth Amendments of the Constitution. As explained further below, the motion is granted in part and denied in part.

FACTUAL BACKGROUND

Events relating to this case began, at least according to Bakalich, when certain members of the Bellwood Police Department filed a lawsuit in 2000 to compel the Village of Bellwood to properly fund the Police Pension Fund ("Fund").[2] (D.E. 48 ¶ 25.) Randolph Leslie ("Leslie"), as

---

[1] The Defendants are: the Village of Bellwood, Dr. Frank A. Pasquale ("Mayor Pasquale"), Jann A. Beuchamp, Michael J. Ciavattone, Annie N. Delgado, Arthur G. Grapenthien, Tieran Perkins, Michael A. Rogers, Jerry Artis, Charles P. Moreland, and Eula Mitchell (collectively "Defendants"). The Defendants, save for the Village of Bellwood, are collectively referred to by the parties as the "individual defendants."

[2] Docket entries are cited as "D.E. __," followed by the appropriate page numbers. The relevant facts are taken from the Defendant's Local Rule 56.1 ("L.R. 56.1") statement of facts and exhibits, Plaintiff's response to Defendant's statement of facts, Plaintiff's LR 56.1 statement of facts, Defendant's response to Plaintiff's statement of

president of the Fund, and Bakalich, as secretary of the Fund, authorized the lawsuit. (*Id.* ¶¶ 23, 25-28.) An agreement was reached in late 2001, but in December 2002, Leslie and Bakalich again indicated that they believed the Fund was not properly funded and took further action. (*Id.* ¶ 30.) In any event, on November 16, 2001, during the Fund controversy, the Police Department, allegedly at the behest of the Police Chief, the Deputy Chief, and Mayor Pasquale, instituted new policies with respect to supervisory personnel, including reduced payments for overtime work, a "rotating" shift system, and denial of payment for accumulated holiday pay.[3] (*See, e.g., id.* ¶ 82.) There also appears to have been a meeting on November 28, 2001, at which Mayor Pasquale, who appears to have been newly elected, told those assembled, including apparently most if not all of the members of the police force, that "I am the Mayor now. You have no union to protect you. All you have is me to protect you. There will be some changes made. If you don't like those changes, don't let the door hit you in the ass on the way out." (*Id.* ¶¶ 33-34.)

Soon after the meeting to review the new policies, Leslie, Bakalich, and a few others developed a plan to unionize. (*Id.* ¶¶ 41-42.) Mayor Pasquale allegedly received notification of Bakalich's involvement in the unionization effort through Commander Russ Mangano, an ally of the Mayor. (*Id.* ¶¶ 95-97.)

On December 18, 2002, Bellwood enacted a new ordinance (No. 02-55) that amended

---

facts, and Plaintiff's supplemental statement of facts in opposition to summary judgment. Where the parties disagree over a relevant fact, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in the non-movant's favor. *See Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

[3] It does not appear that Bakalich, who held a unionized patrolman position, was affected by these policy changes. A review of Plaintiff's Statement of Additional Facts reveals no allegation that Bakalich was injured save for his lost chance of being promoted to Sergeant—a subject which is addressed in the body of this opinion. (*See* D.E. 48.)

2

Section 33.35 of the Village Code to restructure the police department.[4] (D.E. 40 ¶ 132.) Specifically, the ordinance required that, through attrition, the number of Sergeants and Lieutenants be reduced from eight to seven, and four to one, respectively. (*Id.*) Ordinance No. 02-55 also created three new "Commander" positions to be drawn from the existing ranks. (*Id.*) The ordinance gave the Police Chief authority to appoint Commanders, subject to the approval of the Mayor/Village President (*id.*); however, Plaintiff maintains that, in practice, Mayor Pasquale controls Commander appointments. (*See* D.E. 48 ¶ 52.)

On September 24, 2003, Bellwood enacted an ordinance (No. 03-52) further modifying the structure of the Police Department.[5] (D.E. 40 ¶ 152.) Ordinance No. 03-52 provided that "[t]he Lieutenant and Sergeant positions shall be eliminated through attrition." (*Id.*) The proffered rationale for these changes was to provide flexibility in the Police Force and to give the Police Chief greater authority over his personnel. (*See, e.g., id.* ¶¶ 154-155.) Plaintiff maintains that the changes were designed to allow Mayor Pasquale to exercise greater control over the Police Force. (*See, e.g.,* D.E. 48 ¶¶ 52-54, 99-100.)

---

[4] Ordinance No. 02-55, enacted December 18, 2002, amended Section 33.35 of the Village Code, which, following amendment, provided that: "The police department shall consist of the following sworn personnel: four (4) Lieutenants which through attrition shall be reduced to one (1) Lieutenant, eight (8) Sergeants which through attrition shall be reduced to seven (7) Sergeants, and thirty-five (35) patrol officers; from the existing ranks of the police department one (1) Chief of Police and one (1) Deputy Chief shall be appointed by the Village President and Board of Trustees, further from the existing ranks of the police department three (3) Commanders shall be appointed by the Chief of Police with the approval of the Village President to assist the Chief and Deputy Chief in the supervision and operations of the police department."

[5] Ordinance No. 03-52, enacted September 24, 2003, amended Section 33.35 of the Village Code, which, following amendment, provided that: "The police department shall consist of the following sworn personnel: one (1) Police Chief, two (2) Deputy Chiefs; Three (3) Lieutenants; eight (8) Sergeants; and thirty-five (35) patrol officers. The Lieutenant and Sergeant positions shall be eliminated through attrition. From these ranks, three members of the Department will receive extra duty assignments as Commanders, who shall be appointed by the Chief of Police with the approval of the Village President to assist the Chief and Deputy Chiefs in the supervision and operations of the police department. The assignment of Commander is not a rank within the Department."

On or about the time Ordinance No. 02-55 was enacted, Bakalich was ranked number one on the promotional eligibility list for promotion to Sergeant. (*Id.* ¶ 3.) In Illinois, a board of fire and police commissioners may select which candidate to promote from the three highest-ranking candidates on any eligibility list ("the Rule of Three"). (D.E. 40 ¶ 8; 65 ILCS 5/10-2.1015.) Plaintiff maintains that Bellwood had a long-established policy of promoting officers in rank order and that this policy was clearly understood by Plaintiff and other officers. (*See, e.g.*, D.E. 48 ¶¶ 4-5, 7-9.) Plaintiff further alleges that Bellwood established the restructuring ordinance, which prevented him from ascending to the Sergeant rank, as retaliation for his speech relating to the pension fund and unionization efforts. (*See, e.g., id.* ¶ 81.) Defendants contend (and Plaintiff disputes) that the measures were necessitated by soaring personnel costs. (D.E. 40 ¶ 85; D.E. 48 ¶¶ 60-84.)

On August 16, 2004, Defendants moved for summary judgment on multiple grounds. (D.E. 39.) On February 14, 2005, the Court denied Defendants' motion in part and denied it in part without prejudice. (D.E. 58.) The Court gave Defendants leave to submit a renewed motion for summary judgment. (*Id.*) In this regard, the Court requested that the parties discuss precedents governing the admissibility and relevance of "legislative motive," including *Fraternal Order of Police Hobart Lodge #121, Inc. v. City of Hobart*, 864 F.2d 551 (7th Cir. 1988). (D.E. 58 at 3.)

On November 30, 2005, Defendants filed a renewed motion for summary judgment. (D.E. 77.) Prior to the filing of Defendants' motion, Defendants reached a settlement agreement with Leslie, leaving Bakalich as the lone remaining plaintiff. (*Id.* at 2.) The parties, in setting forth their respective versions of the relevant facts, have substantially relied upon, and

4

incorporated, their prior factual presentations.

## STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed R. Civ. P. 56(c); *Foley* 359 F.3d at 928. However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

## DISCUSSION

Defendants move for summary judgment as to the individual defendants on the grounds that Plaintiff has put forth no evidence of their culpability and independently because they enjoy absolute immunity for legislative acts. (D.E. 77.) Defendants further move for summary judgment as to Bellwood on the merits of both of Plaintiff's claims. (*Id.*)

    A.    All of the Independent Defendants Except the Mayor Are Dismissed For Failure of Proof

For a particular defendant to be liable in a Section 1983 action, that defendant must have personally participated in or caused the alleged unconstitutional actions. *See, e.g., Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003) (citing *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th

5

Cir. 1981)). Given this statutory requirement, the Court explicitly requested, in its February 14, 2005 opinion, that Plaintiff "[a]dduce any additional evidence concerning the other board members (*i.e.*, those beyond Mayor Pasquale, who is discussed in the briefs)." (D.E. 58 at 2.) The Court took this step because there was no meaningful discussion of the other individual defendants' actions—other than presumably voting for the challenged ordinances, actions which are covered by absolute legislative immunity, as discussed further below. The Court warned that Plaintiff's failure to adduce such evidence concerning the other individual defendants would result in dismissal of "all of the individual defendants (*i.e.*, other than the Mayor) on the independent ground of failure of proof." (*Id.*) Plaintiff has not adduced or identified any additional evidence with respect to the board members' liability. Consequently, as explained further immediately below, the Court dismisses with prejudice all of the individual defendants for failure of proof, save for Mayor Pasquale, as the Court previously said would occur.[6]

In this regard, as long as the non-movant has notice concerning the possibility of dismissal, the Court properly enters summary judgment on a claim "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-323 (citation omitted). Defendants moved for summary judgment on both claims, putting Plaintiff on notice to set forth all of his

---

[6] The defendants dismissed for failure of proof are Jann A. Beuchamp, Michael J. Ciavattone, Annie N. Delgado, Arthur G. Grapenthien, Tieran Perkins, Michael A. Rogers, Jerry Artis, Charles P. Moreland, and Eula Mitchell.

evidence with respect to the elements of his claim as to the individual defendants. *See, e.g.*, *Kozola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (affirming grant of summary judgment against plaintiff for failure of proof, and stating "[a]s we have often stated, summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'") (collecting cases and quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

With the possible exception of the Mayor, Plaintiff has identified no material evidence concerning the individual defendants at issue. Thus, summary judgment for the individual defendants, save for the Mayor, for failure of proof is warranted. *See Celotex*, 477 U.S. at 322-323; *accord, e.g.*, *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 807 (7th Cir. 2003) (affirming dismissal of several defendants due to failure to show those persons were inside the causal chain beyond performing their bureaucratic roles of transmitting and signing paperwork).

    B.    The Individual Defendants Are Independently Dismissed on Grounds of Legislative Immunity

The individual defendants (including the Mayor) assert that they are entitled to summary judgment because the allegedly-unconstitutional acts in the form of the enacted ordinances restructuring the police department are protected by legislative immunity. (D.E. 77 at 2-3 (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998).) As explained below, the individual defendants are entitled to absolute legislative immunity under the facts of this case, which provides an independent reason warranting dismissal of the individual defendants, including the Mayor.

The individual defendants' immunity defense turns on whether they were engaged in "legislative" or "administrative" activity in proposing, voting for, and signing the disputed municipal ordinances. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity 'would be of little value if legislators could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'" *Id.* at 55 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (internal brackets omitted)).

Sometimes, employment decisions, such as hiring, firing, and promotions, are considered "administrative" for immunity purposes. However, when a department or office is restructured via legislation, the fact that some jobs are eliminated or otherwise altered does not defeat the act's classification as "legislative." *See Bogan*, 523 U.S. at 55-56 (holding that the enactment of a municipal ordinance eliminating plaintiff's position as the director of the city's social services department was "undoubtedly legislative," and stating that "the ordinance, in substance, bore all of the hallmarks of traditional legislation. The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city . . . . Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office."); *accord, e.g., Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) ("Almost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries. This reality, however, does not transform a uniquely legislative function into an administrative one.").

8

In the instant case, Plaintiff admits that both challenged acts were accomplished through an ordinance, not through the acts of an administrator. (D.E. 47 ¶¶ 132, 152.) While the parties disagree about what motivated the restructuring, precedent instructs the Court to look at the nature of the allegedly-unconstitutional acts—in this case, two departmental reorganizations facially affecting all officers—rather than the alleged motivation(s) for the act. *See, e.g., Bogan*, 523 U.S. at 54-55. Under the Supreme Court's teaching in *Bogan*, the enactment of the ordinances restructuring the municipal police department, which also had the effect of diminishing promotion opportunities for Plaintiff, was, "undoubtedly legislative." *Id.* at 56.

Plaintiff, drawing an analogy to judicial immunity, argues that legislative immunity does not make the individual defendants immune from injunctive or declaratory relief. (D.E. 86 at 2-3 (citing *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719 (1980).) The Court respectfully rejects Plaintiff's argument because precedent, including *Supreme Court of Virginia*, teaches that legislative immunity for actions taken in the sphere of legitimate legislative activity is absolute. *See, e.g., Spallone v. United States*, 493 U.S. 265, 278 (1990) ("In *Tenney v. Brandhove*, 341 U.S. 367 (1951), we held that state legislators were absolutely privileged in their legislative acts in an action against them for damages. We applied this same doctrine of legislative immunity . . . to actions for both damages and injunctive relief in *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731-34 (1980)"); *Supreme Court of Virginia*, 446 U.S. at 733 (stating, *inter alia*, that "[i]ndeed, we have recognized elsewhere that a private civil action, whether for an injunction or damages, creates a distraction and forces legislators to divert their time, energy, and attention from their legislative tasks to defend the litigation") (internal punctuation and citation omitted); *Cathy's Tap v. Vill. of*

9

*Mapleton*, 65 F. Supp. 2d 874, 895 (C.D. Ill. 1999) (dismissing claim against town mayor for signing challenged ordinance, and stating that "[i]t is . . . clear from Supreme Court precedent that the absolute immunity afforded to legislators includes immunity for damages, declaratory, and injunctive relief") (collecting cases).

Finally, Plaintiff argues that Defendant Mayor Pasquale has waived any claim of legislative immunity. (D.E. 86 at 4.) This is mistaken. Defendants were given leave by the Court in its February 14, 2005 opinion to (re)assert an immunity defense. (*See* D.E. 58 at 2.) In Defendants' renewed motion for summary judgment, Defendants argued that *Bogan* instructs that "the individual defendants in this case, including Mayor Frank Pasquale, are entitled to legislative immunity." (D.E. 77 at 4 (citing *Bogan,* 523 U.S. at 53-54).) Plaintiff has not explained why *Bogan*, in which the Supreme Court determined that both petitioners—the city's mayor and a city councilwoman— enjoyed absolute legislative immunity, is not sufficient authority for the legislative immunity defense of the individual defendants, including the Mayor. Accordingly, the Court finds that the claims against the individual defendants, including the Mayor, are independently subject to dismissal under the doctrine of absolute legislative immunity.

C. Plaintiff's Due Process Claim (Count I) Is Meritless

Plaintiff alleges that Defendants violated 42 U.S.C. § 1983 when he was deprived of the opportunity of being promoted to Sergeant without due process of law. (D.E. 1 ¶¶ 64-66.) To succeed in an action based upon Section 1983, Plaintiff must establish that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws

of the United States. *See, e.g., Moore v. Muncie Police and Fire Merit Comm'n*, 312 F.3d 322, 326 (7th Cir. 2002); *Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001) (citations omitted). Plaintiff has satisfied the first element because the alleged deprivation of a liberty interest was the result of a municipal ordinance. *See Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 690 (1978); *Sims v. Mulcahy*, 902 F.2d 524, 541 (7th Cir. 1990).

With respect to the second element, Plaintiff is alleging that Defendants' conduct deprived him of due process rights guaranteed by the Fourteenth Amendment. (D.E. 1 ¶¶ 64-66.) Plaintiff has not specified whether he is arguing "procedural" due process or "substantive" due process—he appears to have foregone and/or waived any claim under the latter theory—nor has he set forth any facts or arguments explaining why the process was defective or "shocked the conscience." Regardless of Plaintiff's theory, his claim fails as a matter of law.

1. Procedural Due Process

To prove a "procedural due process" violation, a plaintiff must demonstrate: (1) the existence of a protected property or liberty interest and (2) the deprivation of that interest without due process of law. *See, e.g., Bigby v. City of Chicago*, 766 F.2d 1053, 1056 (7th Cir. 1985); *see also Ellis v. Sheahan*, 412 F.3d 754, 756 (7th Cir. 2005) ("But to have and lose an entitlement is not enough to establish a deprivation of property without due process of law; it establishes only that a deprivation of property has taken place. The plaintiff had to show that the property was taken away from her without [due process of law].") (collecting cases; internal citations and quotations omitted). Thus, if it is clear that the procedures afforded Plaintiff were constitutionally adequate, the Court may grant summary judgment on any procedural due process claim without determining whether Plaintiff had a protected interest in being promoted to the

11

rank of Sergeant. *See, e.g., Celotex*, 477 U.S. at 322-323 (failure of proof concerning an essential element of a claim warrants summary judgment on that claim).

Plaintiff has failed to identify any deficiency in the *process* afforded him. His briefs seem to rely upon a faulty assumption—*i.e.*, if he demonstrates that the restructuring of the Police Force was not motivated by the reasons set forth by Defendants, he has stated a due process claim. *See generally Nisenbaum*, 333 F.3d at 807 ("Proof that the ostensible reason for the reorganization was not the real one does *not* imply that the real reason was forbidden by federal law.") (citation omitted; emphasis in original).

Plaintiff claims that his alleged property interest was deprived by at least one municipal ordinance—namely, ordinance No. 02-55, which reduced the number of Sergeants from eight to seven through attrition. (*See* D.E. 47 ¶ 132; D.E. 87 ¶¶ 1-2 (Plaintiff asserting that the promotional list by which he would claim a right to be made a sergeant expired on May 21, 2003, and further stating that in September 2003, "a new ordinance [No. 03-52] was passed which eliminated all sergeant's and lieutenant's positions through attrition"); D.E. 86 at 8 ("Because the sergeant's promotional list, which is the basis of the plaintiff's claim for promotion, has now expired and, as a result of new testing, a new list has been created, the ordinance [No. 03-52], or any ordinance, setting the number of positions for sergeant clearly is now neutral").[7]) Plaintiff maintains this ordinance was enacted to prevent him (and Leslie) from obtaining a promotion in rank. (*See, e.g.*, D.E. 48 ¶¶ 81-84; D.E. 86 at 8; D.E. 87 ¶¶ 1-2.) However, Plaintiff does not

---

[7] Plaintiff's pleadings also at times reference a subsequent ordinance, No. 03-52, although he expressly states that the new ordinance "setting the number of positions for sergeant clearly is now neutral." (D.E. 86 at 8.) Plaintiff also states that he "does not care whether the ordinance remains valid." (*Id.*) Irrespective of whether Plaintiff's due process claim is based on *only* ordinance No. 02-55 (as appears to be the case) or on No. 03-52 as well, the claim is properly subject to dismissal for the reasons stated herein.

allege that these ordinances were enacted in violation of the applicable rules of legislative procedure.

Precedent instructs that, for the purposes of a procedural due process claim, legislative process *is* due process. *See, e.g., Chicago Bd. of Realtors, Inc. v. Chicago*, 819 F.2d 732, 738-739 (7th Cir. 1987) (citing *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271 (1984); and *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915) (Holmes, J.)). "[For] a legislative rather than adjudicative decision, . . . the due process clause does not require individual hearings before a governmental body takes decisions that affect the interests of persons in the aggregate." *Dawson v. Milwaukee Hous. Auth.*, 930 F.2d 1283, 1286 (7th Cir. 1991) (citing *Atkins v. Parker*, 472 U.S. 115, 129-31 (1985); *Bi-Metallic*, 239 U.S. at 445); *see also Pro-Eco v. Bd. of Comm'rs*, 57 F.3d 505, 513 (7th Cir. 1995) ("Governing bodies may enact generally applicable laws, that is, they may legislate, without affording affected parties so much as notice and an opportunity to be heard" because the general applicability of legislation "provides a substitute safeguard.") (internal quotation marks omitted; collecting precedents, including *Bi-Metallic*, 239 U.S. at 445). All of this teaching is fatal to any procedural due process claim. Furthermore, although not necessary to the Court's ruling on any procedural due process claim, the Court notes that Plaintiff's has not identified in his L.R. 56.1 statement any defective procedures that led to the enactment of the ordinance, nor has Plaintiff made any demand in his request for relief for notice or an individual hearing to contest the diminution and elimination of the Sergeant rank.

For all of these reasons, the Court respectfully rejects any procedural due process claim relating to the passage of the ordinance at issue.

## 2. Substantive Due Process

Plaintiff has not meaningfully articulated any substantive due process claim in this Court, such that the issue is likely waived. To the extent such a claim could fairly be deemed to have been asserted—in that the alleged "retaliatory" nature of the municipal ordinance is so outrageous that the reduction and eventual elimination of the sergeant rank in the town police force violated Plaintiff's "substantive due process" rights under the Fourteenth Amendment—the claim is meritless in any event.

Precedent instructs that, under the doctrine of "substantive due process," the Fourteenth Amendment prohibits "an abuse of government power which 'shocks the conscience.'" *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (quoting *Rochin v. Cal.*, 342 U.S. 165 (1952)). However, "[t]he scope of substantive due process is very limited," *Tun*, 398 F.3d at 902 (citing *Wash. v. Glucksberg*, 521 U.S. 702 (1997)) and "cases abound in which the government action—although thoroughly disapproved of—was found not to shock the conscience." *Tun*, 398 F.3d at 903 (collecting cases). The Court takes no view of whether Plaintiff's factual allegations are in fact correct; however, even if a jury fully credited Plaintiff's allegations that Defendants denied him promotion from police patrolman to police sergeant in retaliation for protected speech and/or initiating litigating against the city, no rational jury could determine that the challenged ordinance "shocks the conscience" within the meaning of applicable precedent. *See, e.g., id.* (collecting cases and discussing a number of egregious acts, some resulting in death, that did not "shock the conscience"); *see also Hobart Lodge #121*, 864 F.2d at 554 ("But who can be surprised that legislators reward their supporters and mulct their opponents? What else is new?"); *see also id.* at 555 ("The desire to reward friends and punish enemies is not the ethic of

the Sermon on the Mount, but neither is it on the same dismal plane with [discrimination on the basis of race or sex].").[8] As a result, any putative substantive due process claim against the Defendants is dismissed.

    D.    The Free Speech Claim (Count Two) Against Bellwood Is Not Properly Dismissed

As for Plaintiff's Free Speech claim, the appropriate analysis proceeds in three steps. First, a court must determine whether the employee's speech was constitutionally protected. *See Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. *See id.* Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech. *Id.* (collecting cases).

Defendant's motion for summary judgment advances one argument with respect to Plaintiff's free speech claim—that "evidence concerning the motives of a legislative body is inadmissible to demonstrate a violation of the First Amendment." (D.E. 77 at 6 (citing *Hobart Lodge #121*, 864 F.2d at 554).) Defendant has not meaningfully argued in its motion that there is no triable issue concerning whether Plaintiff's speech was constitutionally protected or the ordinance would have been enacted in the absence of the allegedly-illicit motive. Instead, in their renewed motion for summary judgment, Defendants framed the issue as a pure question of law. (*See* D.E. 77 at 6-8.) Consequently, any fact-based objections not raised in the instant motion are deemed waived for summary judgment purposes.

---

[8]    The Court takes notice that subsequent precedent may hold that, in certain instances, political hiring and firing may violate the First Amendment. *See, e.g.*, D.E.86 at 12-13 (discussing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990)). However, the specific holding in *Rutan* does not detract from Judge Posner's observation in *Hobart Lodge #121* that political patronage systems are not worthy of the moral scorn reserved for invidious forms of discrimination.

In *Hobart Lodge #121*, the Seventh Circuit taught that a default rule—"[c]ourts will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive," *id.* at 554 (internal quotation marks and citation omitted)—applies unless the contested statute or ordinance is "challenged as discriminating on invidious grounds such as race, religion, and sex," or "single[s] out particular individuals or groups for benefits or burdens." *Id.* (collecting cases). There is no contention that this case involves racial, ethnic, or sex-based discrimination.

There is, however, a possibility that the ordinance singles out individuals or groups for benefits or burdens. Unfortunately, the parties' briefing on this central issue—briefing that was requested by the Court in its February 14, 2005 opinion—does not meaningfully discuss this possibility. Defendants refuse to entertain the non-trivial possibility that a provision which affects a small number of policemen, compared to the City of Hobart's general civil service reform ordinance, singles out particular individuals or groups. *See id.* (collecting cases). Plaintiff, for his part, instead of accepting *Hobart Lodge #121*, makes the, with all due respect, unhelpful argument that *Hobart Lodge #121* is no longer good law, either because it was wrong in the first instance (D.E. 86 at 8-11), or because it was overruled by *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990).[9] (D.E. 86 at 12-13.) The bulk of this argument by Plaintiff is devoted to sarcastically attacking the Seventh Circuit's decision and reasoning in *Hobart Lodge #121*. (*See, e.g.*, D.E. 86 at 10 (Plaintiff asserting that the Seventh Circuit, in rendering its decision, "was forced to dance past substantial Supreme Court precedent"); *id.* (asserting that

---

[9] As to the relationship between *Hobart Lodge #121* and *Rutan*, the latter case did not address the proper standard for inquiring into legislative motives—it was taken as a given that the Illinois Governor was using party affiliation as a proxy for employment decisions. *See Rutan v. Republican Party*, 497 U.S. 62, 66 (U.S. 1990). Furthermore, the issue in *Rutan* was whether party-affiliated hiring and firing of non-policy makers implicated the First Amendment right of political association.

"[t]he *Hobart* court also had to find its way around" a prior Seventh Circuit case).) Whatever merit this style of advocacy might conceivably have in some other forum, it is not promising here, as a district court is bound to faithfully apply the holdings and reasoning of circuit precedents.

The plaintiffs in *Hobart Lodge #121* were policemen who alleged that the lame-duck City Council enacted an ordinance requiring all city employees to work forty-hour weeks as retaliation for the policemen opposing the incumbents during a recent election. *Id.*, 864 F.2d at 554. The issue on appeal was whether an ordinance resulting from a legislature's admitted "illicit motive" could provide the basis for a First Amendment claim. *Id.* The Seventh Circuit synthesized arguably-conflicting precedents along the following lines:

> We think [the principle that courts will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive] survives undiminished in cases such as this where the statute or ordinance does not single out particular individuals or groups for benefits or burdens and is not challenged as discriminating on invidious grounds such as race, religion, and sex. In *Vandenplas v. City of Muskego*, 753 F.2d 555, 560 (7th Cir. 1985), on which the plaintiffs in this case rely heavily and which contains a dictum that the motives of the members of the city council "would presumably be relevant" in "a case where facts implicating the First Amendment were properly alleged" (emphasis omitted), the council had refused to pass a resolution that would have rescinded a "raze order" for the destruction of two buildings that the plaintiffs owned. Unlike this case, the council's action was directed against the plaintiffs and no one else. And in *Feeney v. Massachusetts*, 442 U.S. 256 (1979), the statute unsuccessfully challenged as discriminating against women gave job preferences to veterans. It was apparent from the statute that one group, veterans, was being benefitted, obviously at the expense of another group–non-veterans–to which the plaintiffs belonged.
>
> No outside observer reading Hobart's 40-hour-a-week ordinance would suppose it directed against the police or any other definable group. It does not mention police, whereas the statute in *Feeney* mentioned veterans. It appears to be an utterly commonplace personnel regulation.

*Id.*

17

The Seventh Circuit's explanation of the caselaw suggests that a triable issue exists with respect to Plaintiff's First Amendment claim. The ordinance at issue here was not an "utterly commonplace personnel regulation"—it regulated Police Department structure and nothing else. (*See* D.E. 40 ¶¶ 132, 152.) Furthermore, a small group of persons—*i.e.*, those eligible for promotion under the existing lists—were disadvantaged by the elimination of those positions. As a result, a trial is required to resolve Plaintiff's First Amendment claim against the city. *See Hobart*, 864 F.2d at 554.

> E. The Defense's "Practical Considerations" Argument Does Not Compel Summary Judgment Against Plaintiff on Count Two

The Defense argues that summary judgment is warranted due to "practical considerations," namely that Plaintiff cannot be promoted to a non-existent promotion. (*See* D.E. 77 at 8.) Defendant further argues that any remedy based upon lost wages would have "no cut-off timewise" and would have a "domino effect" on the Police Department's pay scale. (*Id.*) The Court is sensitive to these concerns and notes that Plaintiff has not identified any authority that would permit the Court to substantially reorganize Bellwood's police force in order to remedy his alleged injuries. *See generally Alliance to End Repression v. City of Chicago*, 237 F.3d 799, 801 (7th Cir. 2001) (collecting cases noting limits on district court's equitable discretion, including *Missouri v. Jenkins*, 515 U.S. 70, 99 (1995)); *see also Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 376 (4th Cir. 1995) (collecting precedents and noting, in Title VII context, judicial reluctance to micromanage important personnel decisions such as appointment of a professor at the economics department of a college).

The Court also notes that the record is unclear as to whether Plaintiff could demonstrate a

18

proximate harm resulting from the enactment of Ordinance No. 02-55, even assuming that the ordinance was enacted for retaliatory reasons. Specifically, Plaintiff states that "the sergeant's promotional list," under which he claims entitlement to promotion, "was due to expire in on [sic] May 21, 2003" (D.E. 86 at 3), and Plaintiff further appears to contend that the vacancy for sergeant would not come open until January 2004. (*See id.* ("The number of sergeant positions was reduced from 8 to 7 on December 18, 2002 [via Ordinance No. 02-55], when defendants knew that the retirement of Ed Pacelli, scheduled for January 2004, was going to create an opening for sergeant . . . .").) As previously alluded to, Plaintiff also acknowledges that Ordinance No. 03-52, enacted in September 2003, "or any ordinance, setting the number of positions for sergeant clearly is now neutral," because it would have predated the generation of the most recent promotional list for sergeant and therefore could not be taken to be targeting Plaintiff. (*Id.* at 8; *see also id.* (Plaintiff explaining that he "does not care whether [Ordinance No. 03-52] remains valid.").)

These concerns may preclude the Plaintiff from showing that Ordinance No. 02-55 caused him any proximate harm. The concerns also will need to be comprehensively addressed if and when Defendants are found liable, in that, as explained above, this Court will, at a minimum, have great pause about suggesting to the people and law enforcement professionals of the Village of Bellwood how they ought to best structure their police department. For present purposes, summary dismissal of Plaintiff's First Amendment claim on the basis of these considerations is unwarranted. Plaintiff likely could recover money damages for some of his injuries, even if broader injunctive relief is unavailable or imprudent. *See, e.g., Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (discussing availability, in Title VII context, of "front

pay" in lieu of barriers to plaintiff being reinstated). Accordingly, and because Defendants have cited no authority suggesting that outright dismissal of Plaintiff's claim is appropriate because of potential remedy limitations, the Court declines the invitation to summarily dismiss Plaintiff's First Amendment claim.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (D.E. 77) is granted in part and denied in part.

So Ordered.

                                                    Mark Filip
United States District Judge
Northern District of Illinois

Dated: 5/17/06